The Rinehart Oil News Company (Formerly The Rinehart Oil News Company of Texas) v. Commissioner.
Rinehart Oil News Co. v. Commissioner
Docket No. 1094-63.
United States Tax Court
T.C. Memo 1965-178; 1965 Tax Ct. Memo LEXIS 149; 24 T.C.M. (CCH) 942; T.C.M. (RIA) 65178; June 29, 1965
*149 Petitioner paid $200,000 for certain assets of Five Star Oil Reports, Inc., and the noncompetition agreements of four shareholders. Ten thousand dollars of the purchase price was allocated to the goodwill and going-concern value and the remaining $190,000 was not allocated. On the facts, held, that the entire $190,000 was paid for Five Star's circulation structure. Richard A. Freling, Mercantile Dallas Bldg., Dallas, Tex., and Joe Gray, for the petitioner. James F. Hart, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined the following deficiencies in the income tax of petitioner: Taxable Year Ended
Deficiency
Dec. 31, 1958 [1]
$31,773.15
Dec. 31, 1959
28,019.67
Dec. 31, 1960
16,978.63
Certain adjustments made by respondent in the notice of deficiency were not contested by petitioner. The Rinehart Oil News Company purchased certain assets, including goodwill, going-concern value, and circulation structure, of Five *150 Star Reports, Inc., its individual covenants not to compete and the covenants of four of its shareholders. The only issue for decision is whether any part of the purchase price represents the cost of acquiring the covenants not to compete. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The Rinehart Oil News Company (formerly The Rinehart Oil News Company of Texas and hereinafter sometimes referred to as petitioner) is a corporation organized under the laws of Texas, with its offices at 2300 Reagan Street, Dallas, Texas. Petitioner keeps its books and prepares its income tax returns on a calendar year basis using the accrual method of accounting. Its Federal income tax returns for the years in issue were filed with the district director of internal revenue for the Northern District of Texas, Dallas, Texas. On or about July 25, 1962, petitioner changed its corporate name in the manner prescribed by Texas law so that it is now The Rinehart Oil News Company. Petitioner was organized on June 8, 1931, by Ira Rinehart (sometimes hereinafter referred to as Rinehart). Beginning in 1925, Rinehart developed and perfected methods of obtaining *151 and publishing current information about the exploration and operation of wells in the oil and gas industry. Since its incorporation petitioner has been engaged continuously in the business of publishing and selling various reports throughout sections of the southwest United States. They provide statistical data and other information concerning new locations for oil and gas wells, the drilling progress on them, and their completion dates. Subscribers to petitioner's reports are persons or businesses engaged or interested in the oil and gas industry or related industries, such as major oil companies, independent oil operators, service companies, equipment companies, and drilling contractors. There is a limited market for petitioner's reports, which contain no advertising, but only current, historical and statistical information. The cost and type of information contained in the reports makes subscription prohibitive unless the subscriber works with the reports and uses them actively in his business. Consequently, active oil and gas producers and exploration companies, geological and engineering departments, and banks in some areas are the best potential subscribers. Most states *152 require that information pertaining to drilling a well or other exploration or refining activities be filed with the appropriate regulatory body. Petitioner has offices convenient to these regulatory bodies throughout the United States and petitioner's representatives are in daily (or more frequent) contact with them. Additional information about new companies or firms entering the oil and gas business is obtained from petitioner's field personnel in an exchange of information with service companies. Petitioner keeps abreast of all companies or firms entering the oil and gas industry. It is well known throughout the United States because of the number of years during which it has been engaged in business and therefore obtains references of new businesses from banks, brokerage houses, and chambers of commerce. The format of petitioner's reports has basically been the same throughout its years of publication. A typical daily report is broken down into divisions containing late field reports, new locations, well completions, drilling progress, and filings. When an operator files an intent to drill a well with the appropriate governmental agency, the information is picked up by petitioner. *153 The operator is immediately contacted and from that point on the petitioner is in continuous communication to learn of drilling progress, testing, and the results of completion. Information is transmitted between petitioner's offices by teletype, telephone, and mail, although personal contact is equally as important in obtaining the information for these reports. Most operators will not release information to anyone other than the representatives of bona fide oil reporting firms. Petitioner's representatives have established excellent relationships with operators over years of contact and frequently reciprocate with information concerning areas in which an operator may not subscribe to one of petitioner's reports. Petitioner also publishes a "well-completion" card service for those areas in which it publishes reports. Ira Rinehart died on October 8, 1939. Pursuant to his will the controlling stock interest in petitioner passed to his wife, Betty, who thereafter married John R. Less. Less is now chairman of petitioner's board of directors. During the years in issue, Betty Less was petitioner's president. Under the terms of Rinehart's will, a small amount of petitioner's stock *154 went to E. N. Redden (sometimes hereinafter referred to as Redden), an employee of petitioner. Redden held various positions with petitioner. He had been an editorial writer, the manager and secretary of the corporation, as well as a shareholder. By 1950 he was the operating head of petitioner, in charge of all operations, offices, employees, and news-gathering facilities. In this capacity Redden knew the cost of operating petitioner's business, its methods of obtaining and compiling statistical data and information, its pricing structure, and the precise makeup and character of its reports. He also knew a great number of petitioner's subscribers and at times attended meetings of the International Petroleum Association of America. On or about May 1, 1950, Redden and four other employees of petitioner organized Five Star Oil Reports, Inc. (hereinafter sometimes referred to as Five Star), to compete with petitioner. The incorporators of Five Star were Redden, W. D. Thorn, Luther R. Graham, Frank Gardner, and T. D. Burnett. Graham and Thorn operated one of petitioner's publishing offices. Gardner headed petitioner's special publications department. Burnett was head of petitioner's sales *155 department. Redden was petitioner's executive vice president and general manager. Five Star began competing with petitioner in publishing and selling oil reports and well-completion cards covering Texas, South Louisiana, and Southeastern New Mexico. Five Star published daily reports, semiweekly reports, and weekly reports in virtually the identical areas for which petitioner published comparable reports. The same was true of the well-completion cards. The physical appearance and format of Five Star's reports were identical to that of petitioner's and they contained essentially the same information, such as front-page news, location, drilling reports, and completions. Prior to Five Star's entry into the business, petitioner had no statewide competition from publishers in Texas, Louisiana, or New Mexico although there was local competition in some areas. Five Star's business proved unsuccessful. Dan M. Moody, Five Star's principal shareholder, contacted the Lesses about the prospect of merging the petitioner and Five Star or exchanging petitioner's stock for Five Star stock. After further negotiations, the Lesses requested Charles G. Bates, petitioner's public accountant, to examine *156 Five Star's books and records. Bates reviewed Five Star's certified statements with Winthrop Carter, the certified public accountant who compiled them. Bates determined that Five Star had incurred operating losses since its inception and as of the date of his examination in 1956 these losses aggregated approximately $208,000. He also concluded that the corporation's liabilities were sizeable and that it had considerable prepaid subscriptions which it had the liability of servicing. Based upon Bates' findings, the Lesses decided to purchase only certain assets of Five Star and covenants not to compete of Redden, Thorn, Graham, and Carl Fink, a former employee of petitioner who had joined Five Star after its incorporation. Each possessed particular skills or knowledge which he might use to compete against petitioner. They had been trained in petitioner's methods of operations, they knew the basic methods of gathering information, and they knew the operations of governmental agencies which were primary sources of petitioner's information. Finally, they knew the particular techniques necessary to put together and edit the news published by a publication seeking to compete with petitioner. *157 The parties met again to arrive at a purchase price. The Lesses were represented at this meeting by Edgar Hoppe, an attorney and certified public accountant. Hoppe informed Moody and Redden, who represented Five Star during these negotiations, that payments for a covenant not to compete would be a deductible item to petitioner and an ordinary income item to the recipients. As a result of the meeting, petitioner agreed to purchase, in addition to the covenants, Five Star's goodwill, going-concern value, and circulation structure. The total sales price agreed upon was $200,000, $10,000 of which was allocated to the goodwill and going-concern value in the following language: FIVE-STAR agrees to sell and RINEHART agrees to buy the goodwill and going-concern value of all the oil reports now published by FIVE-STAR, and upon approval and ratification of this instrument by all of the stockholders and directors of FIVE-STAR, then by this contract FIVE-STAR shall and does hereby Bargain, Sell, Transfer and Assign unto RINEHART the said goodwill and going-concern business of publishing all of the oil reports now published or heretofore published by FIVE-STAR for the sum of Ten Thousand and *158 No/100 ($10,000.00) Dollars and upon the further agreements hereafter set forth. The covenants no to compete are only mentioned once in the contract and no specific portion of the purchase price is allocated to them. The contract provides: It is expressly agreed that of the payments specified in the preceding paragraph, the sum of Ten Thousand ($10,000.) Dollars shall be compensation for the goodwill and going-concern value of the oil report business heretofore conducted by FIVE-STAR. In consideration thereof FIVE-STAR OIL REPORTS, INCORPORATED and the undersigned E. N. REDDEN, WILLIAM THORN, RAY GRAHAM and CARL FINK, individually do each covenant and agree that we will not engage in publishing any oil report or other publication of any kind or character, either as principal, agent, employee or in any other capacity in any area of the United States of America wherein RINEHART has subscribers for its oil report, or other publications for a period of five years from the effective date of this agreement. The entire consideration of $200,000 paid to Five Star was to be obtained exclusively from renewals of subscriptions by the former customers of Five Star transferred to petitioner *159 under the contract as follows: RINEHART agrees to pay to FIVE-STAR twenty-five (25%) percent of all sums collected in cash by RINEHART from FIVE-STAR subscribers applicable to the fiscal period from March 15, 1957 to March 31, 1958, and a like percentage of funds collected for the fiscal year beginning April 1, 1958, and ending March 31, 1959. RINEHART shall pay to FIVE-STAR twenty (20%) per cent of all sums collected in cash by RINEHART from FIVE-STAR subscribers applicable to the fiscal year from April 1, 1959, to March 31, 1960, and a like percentage of funds collected for the fiscal year beginning April 1, 1960, and ending March 31, 1961. For the purpose of this paragraph, FIVE-STAR subscribers shown on the list referred to in paragraph 2 shall include any who resubscribe within ninety (90) days after a cancellation to a report substantially the same as published by FIVE-STAR as of March 12, 1957. Provided FIVE-STAR shall have received the whole sum of $200,000 from the percentages of collections set forth hereinabove, RINEHART shall then be under no further obligation to FIVE-STAR from and after March 31, 1961. However, if less than $200,000 has been paid on said March 31, 1961, then *160 RINEHART shall pay to FIVE-STAR fifteen (15%) per cent of money collected in cash by RINEHART from FIVE-STAR subscribers after March 31, 1961, until the whole sum from all of such percentage payments shall be $200,000. The contract further provided for the assignment by Five Star of all its rights in and to the name Five Star. Following the sale, and in the years 1957 through 1961, petitioner continued to publish a separate report under the name of Five Star and sold it to both the former customers of Five Star and also to its own new subscribers. In addition, many persons and firms subscribed to the regular reports of petitioner and also to the reports published by petitioner under the name of Five Star. Pursuant to the terms of the contract set out above, petitioner paid Five Star the total consideration of $200,000 as follows: 1957
$ 37,399.83
1958
51,213.85
1959
43,871.27
1960
35,129.69
1961
25,536.32
1962
6,849.04
Total
$200,000.00
Immediately following the sale on March 15, 1957, Five Star Oil Reports, Inc., liquidated. The entire consideration of $200,000 paid by petitioner together with other assets, was distributed pro rata to the shareholders *161 of Five Star. Out of the sales proceeds, the former employees of petitioner, who signed the covenants not to compete, received a distribution of $1.08 for each share of stock owned by them in Five Star as follows: No.
Amount Paid
Amount
Name
Shares
for Stock
Received
Redden
2,000
$ 2,000
$ 2,160
Thorn
6,000
6,000
6,480
Graham
4,000
4,000
4,320
Fink
3,000
3,000
3,240
Total
15,000
$15,000
$16,200
The total outstanding number of shares of stock of Five Star was approximately 150,000. The balance of the sales price paid by petitioner ($183,800) was distributed pro rata to the other stockholders of Five Star, none of whom had signed noncompetition agreements with petitioner. In its income tax returns for the years 1958, 1959, 1960, and 1961 petitioner claimed deductions for amortization of these covenants in the respective amounts of $51,280.52, $43,871.27, $35,271.46, and $25,536.32. Respondent's notice of deficiency disallowed these deductions, claiming that they represented unamortizable capital expenditures. Ultimate Findings No part of the $200,000 paid by petitioner to Five Star Reports, Inc., represents payment for the *162 covenants not to compete. Ten thousand dollars represents the cost of the goodwill and going-concern value of Five Star and the remaining $190,000 represents the price paid by petitioner for Five Star's circulation structure. Opinion Petitioner contends that the payments made to Five Star were for certain covenants not to compete, purchased along with other assets of Five Star under the contract of sale dated March 15, 1957. To the contrary, respondent contends that the payments represent nondeductible capital expenditures. We agree with respondent. The issue is factual. , affd. (C.A. 4, 1960), certiorari denied . While no one fact is conclusive, , there are several factors present which support our ultimate finding that no consideration was paid for the convenants not to compete. First, the contract contains no allocation of purchase price to the convenants. This is strong evidence that no allocation was in fact intended. *163 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. Second, the mere fact that the convenants might possibly have some value and may have played a part in the entire transaction does not require either the parties or this Court to allocate a part of the purchase price to them. Both petitioner and the representatives of Five Star were aware of the convenants and, after extensive arm's-length negotiations, both chose not to allocate any part of the purchase price. As the Court of Appeals pointed out in : It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchase price be allocated to this important and valuable covenant, that intention must be respected. Unless respected, the tax consequences which they contemplated as incident to the benefits and burdens of the contract must be disturbed. Third, petitioner takes the position that no allocation was made to the covenants because the entire $190,000 was paid for them. To support this, *164 petitioner urges that the subscription lists (and the circulation structure they represented) had no value. The contract, however, expressly provided that the purchase price was to be paid from the subscription proceeds received by petitioner from customers on Five Star's subscription lists. The entire $200,000 paid Five Star by petitioner came from subscribers within the Five Star circulation structure on the date of sale. And, since the amounts paid Five Star during the years 1957 through 1961 represent no more than 25 percent of each year's renewal fees received by petitioner from former Five Star subscribers, it follows that petitioner acquired in excess of $800,000 of future potential business under this contract. Such business potential has substantial value and, in our view, that is exactly what petitioner bought with the $190,000 of unallocated purchase price. Fourth, the petitioner argues that if we find the circulation structure does have value, it partakes of the nature of "goodwill" and is thus paid for by the $10,000 allocated to Five Star's goodwill and "going-concern" value. While it is true that circulation structure closely resembles goodwill, it is nevertheless *165 a separate and distinct asset. , affirming (i931). Finally, we give considerable weight to the fact that the $200,000 distribution to Five Star's shareholders was made according to the amount of stock held by each, without regard to whether or not he entered into a covenant not to compete. The stockholders who did not sign covenants received as much per share of the sales proceeds as those who did. This is "convincing evidence" that nothing was paid for the covenants. Accordingly, from the evidence of record, we hold that the $190,000 of unallocated purchase price represents the cost of acquiring Five Star's circulation structure, an unamortizable capital asset. Cf. , affd. (C.A. 2, 1961). Decision will be entered under Rule 50. Footnotes
1. Part of the 1958 deficiency is due to the disallowance of a net operating loss carryback from the year 1961, which will be controlled by the decision in this case.↩